In this case, we'll adopt 2 by 16-0786. The car, Cabell, a Special Administrator of Johnson, however, is deceased by difficulty on the 1st floor of the Pharmacueticals. The tenant, Laura Morton C. Associates, Corporation of the United States, Governor of New Virginia, and Paulina Morton Medical, is a defendant at her knees. Attorney General on behalf of the accountants, Attorney Mr. Mark T. Shum, Attorney General on behalf of the McAleese, Attorney Mr. Patrick J. O'Connor III, and also, Attorney General on behalf of the McAleese, Attorney Mr. Derek L. Dane Jr. All right, gentlemen, I understand that you have negotiated your time, and I appreciate that. You will hear our bell go off, but if we need it to complete your argument, if you just ask us. And if you are ready, and I do apologize, we were late in this morning's orals and trying to finish those discussions and get ready for yours. So we're a little late, and I do apologize. But is it Mr. Schneid? Yes. You may proceed when you're ready. Good afternoon, Justice Hutchinson, Justice Zinoff, and Justice Burkett. My name is Mark Schneid. I'm here today on behalf of Takara Cabell as Special Administrator of her daughter, Ashanti Webber. I'm here today to ask the Court to reverse the trial court's granting of summary judgment in this case. Because when you look at this case, the facts and the testimony and all the reasonable inferences in the light most favorable to the plaintiff in this case, it is clear that there is sufficient expert testimony from which a jury could infer proximate cause here. There's also a question of fact concerning whether OSCO complied with its standard of care as a pharmacy. There's a question of fact concerning whether Nurse Degate prescribed the old RONDAC with the pseudo-effector when she wrote the prescription. And all the evidence indicates that Nurse Degate expected that Ashanti was going to be getting a medication with pseudo-effector when she wrote her prescription. But now, whether OSCO violated the standard of care really isn't relevant to the foreseeability analysis. Is it? I mean, it's undisputed. There was no generic equivalent. Well, it's relevant, and I'll explain why. First of all, we can all agree that Nurse Degate  have the right to foresee that a pharmacy will comply with its standard of care when we give them a prescription to fill and dispense. So the question is, did OSCO comply with their standard of care? And the problem here is, that's a question of fact. That has never been adjudicated. There are some good arguments, and you raised them, that O'Donnell testified that it was improper to dispense CARDOXIFED from OSCO, or the Alliant documentation said that there's no generic equivalent. That's one argument. The other argument is from the OSCO pharmacists themselves, who said that under these circumstances, without an FDA recall, it was proper to use the formulation you had left over from before the reformulation of the medication. It was complying with the standard of care. So there is a question of fact as to whether OSCO complied with their standard of care, and that's relevant because if Nurse Degate has to foresee that they will comply with their standard of care, and the fact finder believes that they did, then it's all foreseeable to her. What about counsel's argument that you did not provide expert testimony regarding the approximate cause of the plaintiff's injury? Well, that came up a lot in the briefs, and I'd like to address that because that's just not true. It's a four-step process, Your Honors, in this case. Not one single witness can give all the testimony that ties this up. And now we're hazed. Head Note 17 talks about this, that a jury can infer that it was a reasonable, foreseeable consequence, and we do it by a couple things. Nurse Expert Dempsey, she sort of starts by saying there was a violation of the standard of care by writing the prescription. The violation changed the outcome and caused unnecessary risk. The violation caused the Rondek to be prescribed caused carboxyphed to be substituted, caused plaintiff to ingest the pseudoephedrine, and she says if there was no violation, there would be no pseudoephedrine. Now, as a nurse, that's as far as she can go. She cannot say that the pseudoephedrine or the violation caused the death. She's a nurse. She's not qualified to testify about that. That's where others come in, but I'm going to keep going. Dr. Jills himself, he's a medical expert in the case. He's a defendant, but he's a qualified medical doctor, testified that he could foresee that OSCO would substitute a medication in this situation without calling first for clarification. He could foresee that OSCO would use its judgment when deciding to fill the prescription. But there's one problem, isn't there? At the time, and you put this in your complaint, Rondek did not contain pseudoephedrine when Nurse Diggett prescribed it, and there was no generic equivalent at that time. So, again, how would there be a way to foresee then that OSCO would have filled it with carboxyphed? Well, going back to your point, Nurse Diggett didn't know that. But how is that relevant? I'm sorry? How is the fact that she didn't know that relevant? She wrote the prescription for Rondek. Right. How is what was in her mind relevant to what OSCO actually did when they read the prescription? Well, OSCO had a judgment call to make, and there's a question of fact as to whether they did the right one or the wrong one. But going back to what you asked, Nurse Diggett, if we stand in her shoes on December 13, 2005, with the information she knows, she doesn't know about the reformulation. She doesn't know about the new Rondek. She's trying to treat this child with pseudoephedrine and the way she thinks she can do it is by prescribing Rondek. She had no idea there was any new Rondek. So Ashanti didn't die because of something that the OSCO did wrong. Ashanti died because the OSCO gave Ashanti exactly what active ingredient medication Nurse Diggett wanted. But again, I'm not sure I really follow that because, again, at the time, the name, the only thing on that prescription, she didn't prescribe a medication with pseudoephedrine. She prescribed Rondek. And at that time, Rondek did not contain pseudoephedrine. And there was no generic equivalent. There is a question of fact as to which Rondek she meant, Your Honor. There really is. Well, how could the pharmacy ever know that? I mean, Rondek is Rondek based on what they had or were supposed to have on their shelves at the time. Well, but what this Court has to do is look at this case from Nurse Diggett's perspective regarding foreseeability, okay? Not from where the OSCO stands because the Garris case tells us that. That in determining foreseeability of an incident in a case like this, the Court must consider what was apparent to the defendant at the time of his conduct. Not what may become apparent through hindsight. So we have to talk about what Nurse Diggett thought, what her intent was, and what she could expect to happen. And obviously she can expect the mom to take the prescription to the OSCO and get it filled, okay? She can expect the OSCO to comply with the standard of care. And we all seem to disagree about what that is, if they did or not. She could expect a medication to be dispensed, some kind of cough and cold medication. And even Dr. Jill says that he has the expectation that the pharmacy will use its judgment and may substitute. It happens. This is not so unreasonable or so far out there that it doesn't happen. This is the way this works. But didn't your experts actually testify that she would have expected, that is, Nurse Diggett would have expected that OSCO dispensed what she had prescribed? Well, which expert? My pharmacy or my medical doctor? I believe it was the medical doctor. Okay. So that did come out two different ways. Nurse Diggett is my expert. I'm sorry. Nurse Dempsey is my expert who said, if I knew what was in that medication, then I would expect it to be dispensed with what I know to be in it. Right. But your point is when Nurse Diggett prescribed the RONDAC, she intended the medicine to include pseudoephedrine. That was in the testimony. It was totally clear. And there's a question of fact. Your argument is there's still a question of fact as to whether or not OSCO was following the proper standard of care. Right. There's a question of fact. OSCO, if we get to trial, we'll call the OSCO pharmacists. They will say that under the circumstances that were going on here, it was proper and within the standard of care to dispense the generic equivalent to RONDAC, which is the CARB-X effect. Even though they had not put into the computer the notice that no substitutes, this is the new RONDAC? Right. And I think the factual issue that the court should be aware of is because there was no FDA recall. Oftentimes, FDA recalls, I mean, we can use our common sense and experience. FDA recalls follow what the pharmaceutical industry is, the manufacturer of a particular drug, takes action before they're told by the FDA what to do. But I think we have to construe those facts and inferences in favor of the plaintiff. The majority should decide. Yeah. I mean, the way the pharmacist testified is that if it was a recall, then they take action, pull it off, and they cannot sell it or distribute it anymore or dispense it anymore. If it's a reformulation, that's something where they know they can use the old generic equivalent until that's gone and that's proper. Now, that's their argument. But I thought the notice from Alliant was to discontinue use. That's what their notice said. But that's not an FDA recall. That's a manufacturer trying to get a new product in the market chain. And that's what the OSCO computer software manager said about that. It's not necessarily a recall. It's not saying you cannot sell this anymore. It's we're introducing a new reformulation. There's no generic equivalence to it now. So, you know, start stocking that. But the judgment call the pharmacy made is what it is, and it's relevant to the foreseeability from Nurse Degate's standpoint. Because if the OSCO is ultimately right, then Nurse Degate should have foreseen that. And what I'm talking about with the Coons case is about the burden shifting thing. It's not a shifting of the burden, but when defense is trying to say, like your honors are indicating, that the OSCO act, we'll call it, was intervening and broke the chain, that is defendant's burden to show that as a matter of law. So we have a question of fact still. I know we don't maybe like it, but we have a question of fact about the pharmacy's conduct. They can't show that OSCO was negligent as a matter of law here. Not here. Not in summary judgment. Because there's a question of fact. I was going through the connecting the dots for you for the foreseeability and causation. I was saying that Dr. Jills said he would expect OSCO to replace the RONDEC with whatever they had available. That was his testimony. Dr. Jills was aware that there are substitutes for medications that are often prescribed for patients because they can't afford the brand name. So this is something that happens if the doctor knows that they're going to use their judgment and make substitutions. But usually when that happens, and if there is no indication on the script that it's generic or not generic, doesn't the pharmacist discuss that with the person purchasing? I mean, isn't that what usually happens? It could. But, again, we have to construe that question in favor of the plaintiff. I don't know that that should hurt us in this part right now. What normally would happen, I think, from the testimony is that there might be a call from the pharmacist back to the doctor saying, hey, what do you mean by this? It wasn't checked, may substitute or may not substitute. This is a little bit unclear. What should we do? That wasn't done. I agree. But Dr. Jills testifies that if that wasn't done, he'd still be okay with them going ahead and substituting with whatever they had. So that's not something so unusual and so unforeseeable that this court can say that that broke the chain here. So his testimony was not that they could substitute if they called the physician or nurse practitioner? He said he would expect the pharmacist to use his judgment in deciding what was available to dispense? Yeah, page 665. In deposition page 39, he says, and I'll read it a little slower here for you all, if it is not clear that I wrote may not substitute, then I don't want to substitute at all at any time. If it is clear that I have written may substitute, that means it's okay with me. If it's forgotten, it's my customary practice that it's okay if in the pharmacist's judgment that they would replace the medication with a substitute. I ask him, and that sounds like a general practice expectation. He says, correct. And we go on. I ask him, well, what would you expect them to substitute it with? This is on appendix A66, page 41 of the deposition. He said, it depends what's available. So he knows, he expects the pharmacy to make a judgment call and dispense whatever they can based on their standard of care. And that's why that's relevant, kind of circling back to that question. So we had a nurse practitioner, Debsi, with her opinions regarding causation up to the point of the violation caused the ingestion of pseudoephedrine. We have Dr. Jills talking about how he has this expectation that the pharmacy could use their judgment. The pharmacy expert, they're not experts, they're not F3s, but they're pharmacists, Larry Ekstein and Mark Johnson, both said the pharmacy used its judgment here, complied with the standard of care here, and that there was no FDA recall that mandated them to not dispense this anymore. So that's why, and their side of the argument is they were okay with that, and that's the question of the fact we have. Tying this all up is Dr. Mary Case, our forensic pathologist. She's a medical doctor, and she's the one who testifies that Ashanti's death was due to pseudoephedrine. So we do have to connect about four dots to get there, but that's okay. That's what Nauerhase tells us that it's okay to do. It doesn't have to be one single specific witness who's going to say, I have the opinion that it was foreseeable to Nurse Degate that Ashanti would have been given a drug that contained pseudoephedrine as a result of her prescription. I mean, how do we get inside her head as an opinion? Those opinions probably wouldn't be barred anyway as speculative, but we can use what Nurse Degate's testimony was. May I just finish my thought? Yes. We can use what she testified to you about what she knew on that day about this drug and what her expectation was to find out or to see that it was foreseeable to her. Actually, she consulted with the doctor about the diagnosis of pneumonia. Did she also consult with the doctor about the prescription of Rondac? The evidence in the case is no. Dr. Gilles testified he didn't recall anything about the prescription for Rondac until after the lawsuit was filed. There was no conversation about that. That was done by Nurse Degate on her own using his prescription pad, and that was it. Which is obviously permissible. That part's okay. All right. Just this one? Just this book here? Thank you. You'll have an opportunity to respond. All right. Mr. O'Connor and Mr. Bone? Beg. Beg. Pardon me. No worries. I guess Mr. O'Connor's going first. That answered the question I was asking. Thank you. Good afternoon, Justice. Good afternoon. Seeing none, Justice Huffman, Justice Burkett. My name is Patrick O'Connor. I represent Dr. Maxine Gilles and Aurora Emergency Associates Limited. I'm here today to ask that this Court affirm the lower court's decision which granted summary judgment in favor of my clients. An issue that is threefold. One was his plan required to put forth expert testimony to establish proximate cause in this medical malpractice claim. Second, do they have it? And third, was OSCO's substitution of a non-FDA-approved medication foreseeable? With respect to whether they need expert medical testimony, the answer is absolutely. With respect to whether they have it, they do not. Nurse Dempsey testified what she expected. In light of the Rondak prescription, what she would have expected to have happen did not happen in this case. Dr. Just testified not only was it against what he would have expected, but it was an unpredictable, and that's his word, unpredictable outcome. What about Dr. Gilles' testimony that counsel just referred to? That bases on the premise that there is a generic equivalent. Complainant law alleges that there is no generic equivalent for Rondak. The medication that was in Rondak was phenyleptic. Pseudofedrin had been removed as of September 2015. That's a fact. It's undisputed per Plante's allegations. His expectation of what the pharmacy would do, they knew that there had to have been a generic equivalent of Rondak at the time, and there was not one. The issue of whether Osco's conduct was appropriate, that's not an issue here. It's whether it was foreseeable. The pharmacists in this case testified what they did was appropriate because they look at a computer screen. And if the computer screen says there's a generic equivalent, it's okay to dispense it at the store level. When his plaintiff's pharmacology expert, Dr. O'Donnell, testified that it was at the corporate level. The failure to unlink the Rondak from the Carbax effect is what caused the wrong medication to be dispensed. It is unforeseeable. I think you're using in your brief, or maybe it was the other brief, that that was illegal. Talk about that. What's illegal? What regulation? What statute? What are you talking about? Because there's no citation to any particular statute or regulation. That is the opinion of plaintiff's expert, Dr. O'Donnell. He just admittedly does not cite a citation, does not cite a law. But that is the opinion that plaintiff put forward. He's not my expert, Your Honor. That it would be unlawful to do so. Yes, it was. Yes. Because of what? I would defer to the plaintiff and his expert on that, Your Honor. Whose obligation is it to fill in the defense? Or on summary judgment, something for us to say we can agree that this act by OSCO broke the chain because of this. In a medical malpractice claim, Your Honor, plaintiff has a burden of putting forth expert medical testimony. They do not have that in this case. In fact, the expert testimony in this case is the opposite. Therefore, there is no question of fact by which to get to a jury. There's no question that the nurse intended to prescribe a medication that included pseudofedrin, correct? That is what she testified seven years later. That she initially said, I do not know what was in it. I think it was pseudofedrin. She's not sure. But the fact remains, Your Honor, that pseudofedrin was not the active ingredient in Rhonda. Phenolephrine was the ingredient. Had this case occurred in August of 2015, I don't believe we'd be here. Without citing any statutory authority or regulation, why isn't OSCO's conduct still a question of fact for a jury? Because it's a question of whether it's foreseeable, not whether it's appropriate, Your Honor. And it was not foreseeable. Not foreseeable for who? Dygate? Nurse Dygate. I apologize, Your Honor. It's a reasonable clinician standing in the emergency department setting. Nurse Dygate says, I don't know what I would have done had I known about the reformulation. She doesn't have an opinion on that. She didn't know of the reformulation. But the fact of the matter is there was a reformulation that occurred. OSCO was aware of it. OSCO was told that Rhonda was a single-source drug with no generic equivalent. And mentioned pseudoephedrine specifically. Specifically said pseudoephedrine is removed from the old formulation, and we replaced it with phenylephrine. It's undisputed. Had the Rhonda been dispensed as was foreseeable, the patient would not have died of a pseudoephedrine intoxication. The issue of foreseeability in terms of whether the plaintiff has that testimony, I don't believe that this Court needs to look at the expert testimony. They can look at what happened once the motion for summary judgment was filed. The summary judgment was filed on October 30, 2015. Plaintiff filed an affidavit pursuant to Supreme Court Rule 191A, which reads in permanent part, in order to properly respond to defendant's foreseeability arguments in their motions for summary judgment, plaintiff needs additional time to disclose such opinions and respond to the motions. Plaintiffs concede that they didn't have the expert testimony to establish foreseeability. And then you take that with the testimony of Dr. Just, who says it was unforeseeable, with nurse practitioner Dempsey, who says, what happened in this case is not what I would have expected to happen. It is clear that plaintiff has not met the burden to get this case before a jury because they need the expert medical testimony. In this case, what would that have been? In this case, what would that have been? Someone would have needed to testify that what Oscar did in this case was foreseeable. And no, they don't have that. They have the exact opposite testimony. The testimony that occurred in this case is that it was unpredictable. And to go into the issues of why it was unpredictable, you also have Maureen Grove Pharmaceuticals, who is no longer a defendant in this case. But it sounds like it's more, not a medical decision, but a financial decision. Well, if there's a generic equivalent in this case, they could substitute, an argument could substitute. I would put forth to the court that the do not check box, do not substitute box was not checked, so it was improper to substitute. But the fact is there was no generic equivalent. But the reason, if I just heard somebody, and I can't remember if it was you or counsel, the reason that Oscar was not distributing the new RONDAC is because somebody up the corporate line said, we're not going to put that in the computers. So that's a financial decision. I don't see that as a medical decision. No, what happened in judges, they were both in the computers. There were two formulations, one with the phenylephrine and one below it. Go ahead. One below it, which gave an option. The second option, which gave the generic equivalent of the carboxyphen, was not linked in the, unlinked in the computer. Plaintiff's expert says that that's what should have been done. And couple that with the fact that Maureen Grove Pharmaceuticals supplied a non-FDA-approved medication, which is what Oscar relies on them to do to provide FDA-approved medications. And that didn't occur in this case. All of those factors were unforeseeable, which is why plaintiff has not put forth the proper expert testimony. And what is, how are we prescribing a non-FDA-approved drug? We prescribed an FDA-approved drug, Your Honor. RONDAC was FDA-approved. The medication substituted in by OSCO, carboxyphen, was non-FDA-approved, which is not the medication that we prescribed. It was the generic at the time. It was listed as one of the generics per OSCO, but it was not allowed to be, there was no medication for infant children at the time. Just a second. Just a second. Thank you. Thank you. Now Mr. Boehm. May it please the Court, Counsel. My name is Garrett Boehm. I'm here for Proveno. I'll do my best not to duplicate what was already been stated, but I will make a couple of points here in the Court. I will suggest to the Court that there are three cases that this Court should be guided by in this case. One is the Merlot case. It's now 75 years old. It states the law and the law as applicable today. Two is the Coons case, and I will describe why that case is not applicable to this case and actually suggest that summary judgment is appropriate. The third case is the Coranek case. The Coranek case and the Coons case happen within one year of each other. They're both appellate court cases. The test for determining foreseeability, where there is an intervening cause, an intervening act by a third person, oh, I should go back. Those three cases are important because they all involve an intervening act by a third party. There's lots of cases out there talking about when legal cause is met or not. They don't all involve a third party. Those three cases do, which is why I think they are the most relevant for this Court. So an intervening act by a third person is whether the first wrongdoer reasonably might have anticipated the intervening cause as a natural and probable result of the first party's own negligence. That's right out of the Merlot case. So there's three issues, the view of a reasonable person, the limits of natural and probable result, and the control over a third party's actions. On at least 20 occasions in the plaintiff's briefs, and I heard it here again today, the plaintiff was talking about the intent of Nurse Degatti. As the circuit court said in its summary judgment order, the nurse's intentions and understandings without conveyance to OSCO are irrelevant to the issue of approximate cause. What we're here talking about today is what was reasonably foreseeable to a reasonable person standing in the position of Nurse Degatti. What Nurse Degatti intended or understood or anticipated is beside the point. Second, OSCO's conduct was not a natural and probable cause of Avina's agent's act. Probable means having a high chance of occurring. There was no high chance that prior to and upon presentation of the prescription in this case, that OSCO would act the way it did. So let's look at what those acts were prior to receiving the prescription. OSCO decided to ignore a lines letter, the manufacturer's letter, that said this is a single-source drug. No substitutes. Excuse me? No substitutes. And there are no substitutes. And also, do not use the old formulation to fill prescriptions for Rondek. It's pretty clear in this letter. That was not a probable result. That decision to ignore that letter was not a probable result of Provena's agent's act. That act was taken before the prescription was even issued. OSCO's decision to include two versions of Rondek in its computer system, that was not a result of Provena's act. That act occurred before Provena issued or its agent issued that prescription. OSCO's decision not to clarify what a line meant in that letter, they're trying to say it was just a marketing letter. Well, the letter's very clear. If they had any question about it, they certainly could have called and asked, do you really mean we cannot fill this prescription with the old formulation? They didn't call. No clarification was obtained. After receiving their prescription, OSCO acted on its own, independently of Provena and Provena's agent. OSCO's decision to unilaterally issue a non-FDA generic alternative for the old formulation had nothing to do with Provena's act. They decided that on their own. Certainly, the pharmacist could have called Dr. Jills, could have called Nurse Degabi, but didn't do that. We wouldn't be here today if that call had taken place. But it didn't. These are unilateral, independent acts taken by OSCO. So that brings me to this question. You said they wouldn't be here today if they had made the call. If they had made the call to Nurse Degabi, what would she have told them? Well, we don't know. We don't know. But the call was never made. Okay. So we really can't speculate. No, we're going to have no reason to speculate. We're just looking at the facts as they existed on that day. That brings me to the question of control, which is at the heart of Coombs and Provenic. OSCO's conduct, as I've stated, was independent. Provena wasn't able to control what OSCO did. If there was any control that was in that prescription, they said issue Rhonda to this patient. Well, OSCO didn't do that. OSCO didn't issue the formulation as it existed in December of 2005. They decided to issue a formulation that existed and had been superseded by the manufacturer months before. But Nurse Degabi wanted the Sudafedrin, didn't she? Well, that's what we understand seven years later in her deposition. But, again, I would suggest that her intent and what she wanted is irrelevant. The determination is what did that prescription provide for? It simply says Rhonda. It would have made a difference had there been that phone call. Had there been that phone call, I agree, Your Honor, there would have been a difference. But that phone call was not made. So, again, back to the issue of control. Why was there legal foreseeability in Coombs? The issue is control. Why was there no legal foreseeability in Kovac? Again, the issue is control. Here, there was no control of Provena over what OSCO did. In an argument before the circuit court, Plaintiff's counsel said it would have to be a misfill for it to be not foreseeable. I would submit to the court that's what we have here. We have a misfill. It's exactly what we have here. OSCO should have never dispensed a non-FDA alternative generic for an outdated and superseded formulation of a drug. Those acts were not foreseeable, and because of that, defendants are entitled to summary judgment. Does that require a medical expert? Or, as I asked Mr. O'Connor, that wasn't the pharmacist's decision. That was a decision made by a financial person. You know, somebody said in the OSCO chain, we're going to use our old stuff and then we'll have the new stuff. I'm not sure that I would agree that it's a financial decision. I think it's more than a financial decision when two pharmacists, the testimony in the record is that how the OSCO added drugs to its computer system was it went through a review process by at least two pharmacists who looked at the new drug and determined whether or not it should be added to their computer. Here they added a new formulation, but they disregarded the information from the manufacturer that the old formulation should not be filled any longer. And that is more than just a financial decision. That falls under the auspices of health services determination. So I would suggest if that is the case, then according to cases like Simmons, expert testimony is necessary. Even so, taking all the facts in this case together, I don't think there's any way to get to legal foreseeability against Provena and its agent. Thank you. Doesn't the pharmacist Larry Eckstein's opinion that he didn't violate the standard of care create a genuine issue of material fact? Yes, counsel. I don't agree. He was related as an F3 witness. I think he's just an F1 witness in the 213 disclosures. But putting that aside, whether he thinks he complied with the standard of care or not, I don't think it's controlling. I think what's controlling is what occurred, what happened, and were those events, the series of unfortunate events that were negligent conduct by OSCO, was that foreseeable to Provena and its agent? And I would submit the answer to that question is no. Thank you. Thank you, Congressman. Thank you. Thank you. Mr. Schneik? Yes. We would submit to the court that 70 percent of their briefs and about 90 percent of their argument here today have been about the facts of this case. And, you know, as we know from the case law, Gilbert, the purpose of summary judge was not to try a question of fact but to find out if one exists. Clearly one exists because we've been talking about all the different things OSCO could have done, did, shouldn't have done, what Degate could have done. There's questions of fact everywhere here, Your Honors. And I think that that alone is a reason to reverse the trial court. A couple bullet points just to respond. When Dr. Just testified that some things were unpredictable, he was testifying in hindsight after he's already seen all the different product inserts and all the different reformulations of all the different medications. You know, he wasn't asked, Dr. Just, if you were Nurse Degate at the time you wrote this script not knowing what was in this medication, what would you expect? He wasn't asked that. So they're kind of twisting that around a little bit. There is a huge question of fact as to whether there was a generic report point for this or not. They're acting like it's a set-in-stone, done deal. I mean, OSCO pharmacy expert witnesses have disagreed with that all day. The manufacturer doesn't agree with what you just said because they say there's no substitutes. Right. Isn't that what you plead in your complaint as well? As an alternative theory, yes, we did. But there still is a question of fact, and I don't think that's a question of fact that can be construed in favor of the movements in this situation. Somehow it was mentioned that Nurse Degate was going to foresee phenylephrine being used. I think that's what I heard. Based on the evidence that we have from Nurse Degate, how would it ever be foreseeable to her that phenylephrine, Neurondec, would have been given to this child? She didn't even know about it. There can be no expectation on her part of anything other than somehow this child getting pseudofedrin. And what was her testimony regarding pseudofedrin that she would have expected it would have been in? It was her intent. She thought Rondex, that's the ingredient, was pseudofedrin. And she wanted to use the pseudofedrin to help clear the secretions. And she hoped that the pseudofedrin had the antihistamine effect. So everything in her testimony, after she loitered up and everything, was that she wanted pseudofedrin. And I guess the case law tells us how that end result happened. It doesn't have to be foreseeable. So she gives the script. She wants pseudofedrin. Whatever happened at the hospital doesn't have to be foreseeable because the end result was what she wanted. And I have a cite for you on that. But let me just keep on going on. Who decided to administer the dextromethorphan? Dextromethorphan is in the infant Tylenol cough and cold drops. Nurse Degate, during the discharge, told the mom, take these prescriptions, fill them, use them. Also get Tylenol cough and cold medication over the counter and use that for fever as well. Turns out that when that was purchased, it had dextromethorphan in it. But that was because of what Nurse Degate's treatment plan was. All of these drugs that we're talking about today are non-FDA approved. I know he said they were FDA approved. Rundeck was. Never, ever were these drugs FDA approved. I don't want you to get caught up on that at all. They were all non-FDA drugs. That's not in our briefs, but it's in the record. Provena did have control. Provena had control of this situation when their agents decided whether or not to check the box, may substitute or may not substitute. That was the ultimate chance to have control over this. If Nurse Degate checks the box, may not substitute, that changes the analysis here, in my opinion. But she didn't do that. She left it blank on either way, and then someone had to use their judgment in complying with the standard of care at the pharmacy. So if Nurse Degate prescribes the medication with Sulafredrin in her mind, and OSCO says it properly dispensed carboxyphed based on the script, how is it not foreseeable to Degate that OSCO would comply with the standard of care in doing that? She just doesn't have, I guess, the right to say, I could never expect that, because she didn't know about the reformulation or anything else except she wanted Sulafredrin, and she did what she was supposed to do to try to get it for the child. And that's just the bottom line from our perspective. So because we're fighting over the facts and going over this, I think the right thing to do is to reverse the trial court and write an opinion that combines Garris versus Booth language with Knauwe's. And the Garris language that I want this court to include is that in determining the foreseeability of an incident in a medical negligence case, the court must consider what was apparent to the defendant medical provider at the time of her conduct, not what became apparent through hindsight. That's what we have to do. This district and the state needs a case in a medical negligence situation that sets that clear. And I think this is the right case for that. Thank you. Thank you. Thank you, counsel, for your very enlightening argument. And we will be taking the matter into advisement. We will get a decision out in due course. We will now stand adjourned for today, and safe travels wherever you're going.